D.V.D. at all v. U.S. Department of Homeland Security at all. At this time, would Counsel for the Appellants please come to the podium and introduce herself on the record? Good afternoon. Sarah Welch for the United States. If I may, I'd like to reserve four minutes for rebuttal. You may. May I please the court? Last time I was here, I explained that the District Court's preliminary injunction interfered with executing the valid and unchallenged removal orders of illegal aliens who are particularly difficult to remove and intruded on areas that the Constitution and Congress have consigned to the Executive Branch. That's why the Supreme Court has had to intervene twice so far in this case to correct the District Court's overreach. And while it's a pleasure to be before the court again, not much is new this time. The District Court has repeated and added to its errors, and this time this court correctly stepped in to stay that decision. Our previous arguments on the merits and on the majority of the multiple threshold jurisdictional grounds are essentially the same, and they're more than sufficient to resolve this appeal. So absent questions, I'd like to start with the three things that are at least a little bit different in this posture. Those are the 1252F1 argument, which is now about different kinds of relief, class certification and statutory issues. Starting with 1252F1, it still bars the declaratory judgments and the vacater. Plaintiffs say 1252F1 is limited to injunctions that's irreconcilable with the text and with precedent in Alman-Gonzalez. Well, I guess I don't understand the Alman-Gonzalez, which expressly reserves the question, and we have a case that resolves the question, and I understand the Supreme Court may view it differently, but explain to me as a law of the circuit matter why Brito doesn't answer the declaratory judgment aspect of F1. So that's one piece. Brito speaks to declaratory judgments, not to vacaters. The other law of the circuit reason is that Alman-Gonzalez postdates Brito, and Alman-Gonzalez says that restrain in 1252F1 means, quote, check, hold back and prevent. That means that... They reserve a question. Doesn't that mean they haven't decided the question? They haven't decided the ultimate question of which declaratory judgments 1252F1 precludes, but they have resolved what restrain means in a way that's inconsistent with the way that Brito interpreted restrain. The Fifth Circuit also declined to read Alman-Gonzalez in the way you recommend to us. Are there other cases that you would rely on? And I think the D.C. Circuit recently held that F1 is inapplicable to vacateur under the APA. That's right. The D.C. Circuit... So why should we break from the reasoning of either one of those cases? So I think what those cases are overlooking and what they're relying on is unpersuasive. So they're overlooking that enjoin and restrain need to mean two different things. You can see that particularly because F2 speaks to restrain only. And none of those cases that I've seen have given any account for what restrain means that's distinct from a form of injunctive relief that would already be covered by the word enjoin. They don't reconcile their holdings with the fact that Alman-Gonzalez did say that restrain refers to a kind of order that has a particular effect, meaning that it's not referring to a specific individual form of relief. And the kind of effect that Alman-Gonzalez tells us to look for is whether the order checks, holds back, or prevents. The other thing that's specific to this case that I'm not sure was present in the other cases is that this is a Rule 23b2 class, which is permissible only to enter injunctive or comparable declaratory relief. And that makes it particularly difficult to say this is comparable declaratory relief to an injunction, but it's not covered by 1252F1, which covers enjoin or restrain. 1252F1 is speaking about injunctions, and it contemplates injunctions for individuals. And I understand why the declaratory relief makes it easier to go ahead and get the injunction. But of itself, it doesn't do anything. It then is incumbent upon each individual to seek the injunction. And so, to me, that seems different and a reason to find a distinction between declaratory judgments and injunctions. I don't think that's the line that 1252F1 is drawing. It's clearly a statute that's looking at the effect. 1252E, if I forget which, says injunctions or declaratory relief. So that idea is out there, that you would include all of those. And then this one didn't, preserves injunctions for some people, just not classes. And then the effect of the declaration, it seems to me, is just to, it does make it easier to get an injunction, right, for an individual, because this issue has been litigated. But it itself does not enjoin or restrain or do anything. It just announces the district court's view of the law. So I think Congress wrote two different provisions with two different effects. In 1252E, A1A I think is the sub-provision that Your Honor is referring to, and 1252F1. So E is defining specific kinds of relief, specific remedies that are off the table in particular kinds of cases. 1252F1 is looking at effects, and you can see that not just from the fact that it says restrain instead of naming specific remedies that would have the effect of restraining, but also because it says, it looks to the effect on the operation of the statute. It's looking at a real-world effect and not just naming specific remedies. So I think that's the reason that we see those differences in the text between E and F1. And just so I have it, your answer to Brito in law of the case is that this definition of restrain in Alleman, whatever it is, means that the law of the case doctrine does not apply to that case, is inconsistent with Supreme Court precedent, and we should not follow it. So we cited two cases in our briefs from the First Circuit. One says, if a Supreme Court decision overturns a Circuit precedent, of course the Circuit precedent is no longer good law. But also if there's an intervening Supreme Court decision that materially changes the reasoning of the previous decision, then it also doesn't control and can be reconsidered. Your answer to that they expressly reserve the question is, so what, if you take what they said in the text, this is the answer? Yeah, I think Brito didn't grapple with what the Supreme Court has said. The Supreme Court reserved it in Alleman. Your answer to that is, so what, look above the line at the text, and it's inconsistent with Brito. So that they reserved it doesn't mean anything. It certainly means something. It means that Brito isn't by effect of Supreme Court precedent itself overturned. But the reasoning that I'm pointing to in Alleman-Gonzalez is what the Supreme Court said about the meaning of restraint in the specific provision, which is irreconcilable with how the Court interpreted it in Brito. I think we're on the same page about that. The other thing I would say about Brito is that it applies only to the declaratory judgments and not to the vacater. So I'm not aware of Circuit precedent in resolving the question of 1252-F1 with respect to vacater. I think my last point before I move on from 1252-F1 is just that the District Court's remedies are clearly meant to have precisely the prescribed effect of checking, holding back, and preventing DHS from executing third-country removals in accordance with its guidance. If they didn't do that, they wouldn't do anything. Plaintiffs wouldn't have been asking for them, and this Court wouldn't have needed to stay them as it correctly did. I'm happy to move on to class certification as the second difference between this posture and the last posture. There are serious problems with the class as certified. I think we'll probably be coming back to this as we get to the merits, specifically what the problems are, but I'll start with four. Relevant to statutory claims, some class members are ineligible for statutory withholding. Other class members are eligible. Some class members cannot be removed to their home countries because they've already obtained withholding of removal or cap protection from their home countries, while others can. That's particularly relevant to the B-2 claims that the District Court passed on as a class-wide matter. And that's particularly concerning because three of the named class representatives are in the category of aliens who can't be removed to their home countries because they already have protection from removal to their home countries, so they're particularly poor class representatives for the B-2 claims that the District Court resolved. As to the due process claims, some class members have been able to reopen their removal proceedings. We've provided several examples of those instances. Other class members have not been able to, as the District Court pointed out, so that's a significant disuniformity in the class. And the other one I wanted to highlight is that some class members were apprehended at the country's very threshold, went through expedited removal proceedings, and have a reinstated removal order. Do you agree that everyone in the class can either bring a, if they so choose, and of course they don't have to, but could bring a withholding of removal or a cap claim? Some can only bring cap claims. That's not my question. Is every person in the group able to bring one or the other? I believe everyone has had the opportunity to bring at least one of those. Okay. And they do share a common origin in the sense that they are someone who fears either persecution or torture. I would not agree with that as a matter of the class as a whole. The class undoubtedly includes people who have no fear of removal to any country and have not asserted any claim. Right. But one can't know, it seems to me in the abstract, whether one has a fear of a particular country unless one knows the country. So it seems to me that what unifies all of the people is not that they will bring a claim, not that they necessarily will have a fear, but the identity of the country seems essential to make the decision on whether or not you wish to pursue the claim and then if you do, how it plays out. But how can anyone decide whether to pursue a claim if they don't even know the country to which the claim will relate? So I think the disuniformities in the class with respect to how they would pursue that are very relevant to the judgment that the district court entered on a class-wide basis. It just can't be sustained on a class-wide basis. I guess I just don't follow that. Every person has to make a choice and the choice is, depending on different circumstances down the line, but you've agreed with me, everyone has some kind of fear-based claim that maybe they could make. And it seems like the key piece of information to make your decision on whether to pursue the claim or not is where I'm going because the claim itself is about the noncitizen's relationship to some country. And if we don't know what the some country is, how can the person make that decision? I have a few responses to that. I think we're moving on to the merits at this point, which I'm happy to do. Just to briefly flag the class problem, the district court entered judgments with respect to how B-2 applies, sequencing, separate from fear claims at all, even though some of the class members are not even controlled by B-2, some are controlled by B-1, and some of the class members are very differently situated. Is your view on that that there's no standing as to any of the class members as to the sequencing? None of them have established standing as to sequencing. Three of them, at minimum, simply can't pursue the claims that the district court purported to resolve because they have protection from their home countries. I am happy to turn to the merits. It seems to relate to this class question because the class question, as you frame it, is there are all of these sort of downstream differences, and I guess what I'm trying to figure out is does that matter because it strikes me that at a higher level of generality, it does matter that everyone know, or at least I'm positing to you, that everyone know the country so they can make a choice about how to proceed. And the guidance divides class members into two categories. So, again, a class disuniformity. The two categories are individuals who are subject to diplomatic assurances, and those individuals' claims are controlled by their diplomatic assurances. With respect to those individuals, for Matthew's purposes, there is zero risk of erroneous deprivation because it's conclusive for the executive branch that the diplomatic assurances are, if they're found to be credible, that they control the CAT claims and the withholding of removal claims to the extent we're considering those in a class-wide posture. As to the second group, they do receive notice. They receive at least 24 hours of notice just to assert a fear. They don't have to provide any evidence at that point. They just need to assert a fear. They say, I would like to bring a fear-based claim regarding this country that you've served me written notice and read it to me in a language I can understand. At that point, then they go into screening with USCIS and further proceedings if they're determined to have a viable claim. So everyone does have either zero risk of erroneous deprivation because they're subject to credible diplomatic assurances or they do receive that notice and opportunity to assert their fear-based claims. So it hinges on, though, I understand, if you're right about diplomatic assurance, then your position is, well, those people don't need notice because the diplomatic assurance supplants what I was just talking to you about a minute ago. Right, and I think the district court was right to not rest anything on right to further proceedings under CAT or the regulations themselves because the CAT regulations provide that diplomatic assurances are conclusive as to a CAT claim. So even if you were successful in going through screening processes, at the point where you arrive and are subject to those regulations, your claim is precluded by those diplomatic assurances. And why is that the case? I just haven't followed it. Why is that the case for withholding under 1231? Where does the diplomatic assurances supplant the right of a person to pursue a claim for withholding notwithstanding the assurances? So the regulations don't discuss diplomatic assurances with respect to withholding in particular. I think we're operating at an antecedent point before we get into the coverage of the regulations where the agencies are making a determination that the diplomatic assurances are credible and therefore the C3 obligations are discharged. Even though that provision talks about a fact finder and making credibility determinations, all of that, your answer is none of that matters. It's just we have our assurance. Everyone in the class has already been through at least one round of proceedings in which they've been notified that they'll be removed to the designated country unless it's not available. And in that case, they'll be removed to one of the countries established in B2. And they've had the opportunity to raise all of their claims. We think that discharges all obligations under... detail what you mean by diplomatic assurances that are credible in this context. I mean, it's not unusual at all for withholding to be granted when a country is willing to protect but is unable to do so. So I can't pull back the veil that much because this is an executive branch process that has not, you know, been subject to substantial development of precisely what that looks like, precisely because of the Supreme Court decision saying that you can't pull back the veil on what the executive branch is doing to evaluate the credibility of diplomatic assurances. So what do you mean by credibility, credible? So I think things that would be relevant would be the United States diplomatic relationship with that country, the United States communications that they've had with that country, the assessment of the effectiveness of the government, the assessment of conditions on the ground in the country, the assessment of the reliability of proceedings in the justice system of that country. All of those things are things that the State Department is frequently engaged in, in evaluating and in communicating with other countries. They're all things that are highly sensitive and highly confidential and fall well within the realm of foreign relations where courts are particularly loathe to interfere with or even to closely examine what the executive branch... The authority for all of that is Munaf. I mean, that's your basics to say, well, we just tell you it's an assurance and therefore it is. I think Munaf is incredibly emphatic and incredibly persuasive on this point. Except it completely sets aside CAT. I mean, there's an entire footnote about, well, let's be clear, this is not a CAT claim where it's statutorily that the United States has committed itself to not send people to places where they'll be tortured. And there are reasons it may not have applied in the odd circumstances of Munaf, but it does seem like the court specifically recognized what we're saying here may not matter, may be different for CAT. That's right. Munaf wasn't considering CAT and expressed some concerns in that footnote six about whether a CAT claim could be successful. I don't think there's any... But those concerns don't go to what you're talking about. Those are... They're CAT-specific concerns. They're different issues. That's right. The things I think make Munaf particularly significant and persuasive on this point, one, it was considering a U.S. citizen. That's quite significant. This is a person who is entitled to the absolute most due process under the law. And even in that case, the court said that the political branches... The whole thrust of that opinion is a person committing a crime, yes, they're a citizen, in another country on that country's soil and the interference that would be caused if we didn't allow that country to vindicate its own sovereign interests in punishing that person or prosecuting that person. I don't think that's what the opinion is limited to. I think it's also about the competence of the judiciary to second-guess the determinations of the political branches in this realm. And I don't think that's in any way... I'm sorry, I just got rid of that. I don't think that's in any way limited to the particular context of Munaf. The other thing I would point out that makes it a particularly striking decision is that the executive branch had acknowledged that it had concerns about torture in the country where the citizen was going to be extradited and that those concerns were in particular about the specific department that was going to have that individual. So if diplomatic assurances can be credible and can't even be second-guessed, in that extreme of a circumstance, I think it follows a fortiori here that diplomatic assurances can be a reliable tool. The other thing I would point out about any argument that diplomatic assurances can't be preclusive as to CAT claims is that that would require invalidating the regulation that says they are preclusive as to CAT claims. And that is the sort of thing that is foreclosed by FAR 2242D. I don't see how plaintiffs can get around that. Do the diplomatic assurances account for what happens after the person arrives there? And I mean that sort of separate from this line of questioning. But is there any assurance that the third country won't promptly remove the person back to the place where they fear prosecution? It seems to me from the... Sorry. Give us a second here. Is that good, Dan? I think so. Okay. What I'm worried about is the chain refoulement. I'm not sure how to pronounce that. But is there any way for us, or for in your case, where you can tell us how we prevent that, how that's preventable, right? Because that seems a real workaround to everything that we're looking at here. If indeed we send people to a country where we've been given assurances and they're sent right back to the one place we know they do have relief from going to. Right. So I don't think there are any specific countries' diplomatic assurances in the record in this case. So I think that's what the court would need to look to in order to know specifically what the content of those diplomatic assurances is. But I do think the March and July guidance are making clear that the executive branch is determining whether the diplomatic assurances are sufficient to resolve the US's obligation under the Convention Against Torture. Many of the countries where aliens are being removed are also themselves signatories to the Convention Against Torture and have their own obligations against refoulement. I'm not positive if that's true of every single country. Again, that's not something that's been developed in the record. But I think that's the sort of thing that would be an as-applied challenge to any particular country or to any particular agreement. And that's not the sort of thing that we have here, which is a challenge to the suitability of diplomatic assurances in any circumstance or the way that they're being treated under this particular policy. I mean, the other issue... So I think chain refoulement's one issue. The other issue that concerns me is the way that this court has defined both CAT and withholding. It gets down to pretty granular levels of what can constitute a violation of either of those things. So, for example, when it comes to withholding, I was an author of an opinion very recently that said a gang can be a state actor for purposes of withholding because they may have quasi-governmental control over a narrow slice of the country or area or town, and if they're causing the harm, that might count. Now, the government certainly isn't happy that their gang is controlling some city, so that's one example. On the CAT, we've gone down to, say, a rogue officer in some far-flung part of the country who's looking the other way while a group is torturing might be the basis for CAT. I mean, I just can't even understand how you can make assurances at a nationwide level when the law, as it's been developed, applies in this granular way for both withholding and CAT. So I think two responses to that. One is that that's absolutely the sort of thing that the executive branch, secretary of state, DHS, can take into account as they're evaluating the credibility of diplomatic assurances. If a nation says, we can absolutely protect this person from torture or persecution, but the executive branch is aware that there's a city that's controlled by a gang, they say, that's not credible. We believe you're telling us that, intending to tell the truth, but we don't think that you can actually do that based on our assessment of conditions on the ground. So that's absolutely the sort of thing that the executive branch could consider that I think the judiciary is ill-suited to second guess after the executive branch through diplomatic communications has reached a determination. The other thing... I just don't quite understand that answer. Maybe you can help me with my confusion. But just in a typical withholding case or in a CAT claim case, that kind of question gets assessed by an immigration judge, the BIA, and then us. I've never seen somebody come in and play the ace card saying, well, we've got diplomatic assurances, ever. So apparently I've wasted my time for 25 years under your position. I don't think so at all. And I'm happy to speak to that. I think in those cases where an alien has obtained a full adjudication of their withholding or CAT claim, just based on the country conditions, that's one ground on which those cases can be litigated. But the regulations, minimum for CAT, provide for the existence of diplomatic assurances. They say that we can have diplomatic assurances. And at that point, the IJ is just going to say, your claim is denied. We have diplomatic assurances that have been determined to be credible, and that is preclusive for your claim as we're adjudicating it. And I think we would then, if that were subject to a petition for review to a court of appeals like this one, I think we would then be relying on those regulations and on Munoz to say, the judiciary's job here is done. You can assess, you know, just the determination, excuse me, the determination that the IJ made, which is that subject to the regulations, this claim is done. The other thing... Withholding is just, well, it doesn't say anything, but because the attorney general ultimately makes the decision, he can just supplant diplomatic assurances for the notion of hearing and findings of fact that seem to be embedded in 1231b3. Is that what... This may be a more granular answer than you're hoping for, but the regs governing withholding say they apply in removal proceedings and withholding-only proceedings, and the guidance is operating at an antecedent point to that, or it's both after that's already happened and before any reopening were to happen. So it's at that point that they're considering diplomatic assurances, so I don't think the existence of a reg specifically for diplomatic assurances in the withholding context is just particularly relevant. The other thing I wanted to say in response to your earlier question about a particular rogue officer, I think that may be a concern about the permissibility of diplomatic assurances at all. It may be a concern that diplomatic assurances can just never be determined to be credible. I think to the... There's been a debate about whether they should be for the individual, so I can picture an individual and we say, we, country X, we're going to throw all of our resources into this individual and we are telling you we are going to protect them. And I can understand that, maybe, but that's different than across any number of people we are just telling you that they are going to be protected. So the original or one of the early disputes in this case was whether diplomatic assurance operates on that individualized level or across a population. The government's position is it operates across, and that, to me, is a potential distinction. And I have the same answer to that that I had the last time we discussed it, which is that an assurance that's credible with respect to all aliens, for example, you can imagine Canada or the United Kingdom making an assurance that's credible as to all aliens. They will not be persecuted or tortured there. That operates as a assurance with respect to a single individual, which more than satisfies the regulation's reference to an alien or the alien. And the other answer I gave at that point was, if I may, was Svetlana Dove, you know, had just rejected exactly the same sort of argument based on the use of the singular in a statute. And you don't disclose which countries from which we have assurances. Is that right? It's at least not part of the record in this litigation. I'm happy to answer any other questions otherwise I see my time is up. I'm sort of curious about this. I'm not sure it matters, and I'm taking this 15,000 numbers from the plaintiff's brief, but let's just say there have been 15,000 third-country removals while this case has been pending. Do you have any sense of what portion of those people have been granted withholding or cat relief, and what portion were sort of in this category of just, you know, people who couldn't be removed because, say, we didn't have diplomatic relations with the country or whatever else? My answer is going to be unhelpful on two levels. One, I don't know the actual number. I saw the 15,000 number as well. It's just that was submitted after the close of evidence, so we haven't had the opportunity to supply something on that. And two, I don't know the breakdown of class membership. Do you think the 24 hours is required either by the statute's regulations to process, or is that just the grace of the government? I guess I'm not sure we have a position on that. It is, at minimum, the policy that we're defending, and I think it certainly makes our case easier that there is meaningful notice, 24 hours just to assert a fear. If it's grace, there isn't much to test, but if it's required somehow, then we have to ask ourselves, is that sufficient to meet that requirement? So, I mean, it seems to me once we're past diplomatic assurances, it matters a lot as to why did you do this, and then how do we measure whether it's sufficient at what you've done? So, I can imagine a case where we would defend a policy that didn't give 24 hours notice on the ground that 1231B3C applies in the first round process, and I can imagine that the argument would go that 8 CFR 1240.10 says you have to be advised in your initial round of removal proceedings we're designating this country, but you could be removed to any of the other countries specified in B2, and you won't get another round of proceedings, so this is your shot, raise everything. That is what they're instructed under 1240.10, and that we fully discharge the obligations under 1231B3 given that initial round of process. I don't think we have to rest on that here given that we are actually giving either diplomatic assurances that ensure that claims are fully resolved or notice an opportunity to be heard. And before you sit down, can you just, I want to just know your position on the sequencing a little bit more, so that didn't seem to be in the complaint. I'm sorry, just on this last point, I apologize, so you're saying that if third country is in play, there's one shot for the person who's going to be removed to name any country in the world where they might have that concern? So I was answering that. The burden is now on them to do that. I was giving that answer as a hypothetical of how we would operate under a different policy. We are here to defend the policy, and I don't think we've actually taken that position in this litigation that absolutely nothing is required, but I do think it is actually the case and not hypothetically the case that aliens are told in their initial round of removal proceedings that if they can't be removed to the country that's designated, then 1231B2 specifies the other countries that they could be removed to. And they know from that notice that this is their chance to say that I may be tortured or I may be, or it's more likely than not that I will be persecuted. And from the I-589 form that they receive as part of those proceedings which says to list any country where you would fear being removed. Can you agree or disagree with your friends that tell us that those don't actually get adjudicated when they're raised because that country isn't even on the radar at that point? I think the facts on the ground are that they are at least sometimes adjudicated and they are at least sometimes not adjudicated if they're not the designated country. And the at least sometimes adjudicated, an example of that that's cited in the briefs, not for that point, is Savitrop, an unpublished Ninth Circuit decision where an alien was able to receive adjudication of a fear-faced claim to a country that was not at all designated as a country of removal. And as far as sequencing goes, so your position is that's not in the complaint, correct? That's right. And your position is that there's been no, it was raised in the summary judgment papers of your friends, at least briefly, but your position is that there's no standing because each of these named plaintiffs can't be sent to their either designated country or country of citizenship subject or whatever else the other thing is. Is that right? Is C and D? As to each of the four, excuse me, yes, as to each of the four named plaintiffs, that's right. And why is just for each, are you able to just tell me that they are either, they got withhold, can you just explain to me their situations? Right. I just want to make sure I'm getting everyone on the same page. Right. So three of them have either withholding or cap protection from removal to their home countries and I believe that's, I believe DVD is the named class representative who is the outlier for that and I believe DVD is a national of Cuba which has not been willing to accept removals in general. So either they withholding or cap or they have a country that you don't have.  Right. Is OCG's case, is your analysis of OCG's case the same, his removal I think first to Mexico and then to Guatemala, do you think that affects his standing on the sequencing issue or not? I would put OCG in the same category as the other three who can't be removed to their home country or country of citizenship because he has protection from removal to Guatemala. He is back in the United States now. He was initially, it was Mexico who sent him to Guatemala, right? I believe so. Thank you. Thank you counsel. Would counsel for the appellees please introduce yourself on the record to begin. Good afternoon, your honors. Trina Romulo on behalf of plaintiff's appellees. I guess I just want to jump right in and address some of the issues that came up. Maybe sequencing is a good place to start. I'm sorry? Maybe sequencing is a good place to start and whether or not you have standing. Sure. All of the class members have standing to raise the sequencing claim but DVD as well because he can't be removed to Cuba. All of them have a vested interest in having the statutory progressive, the statutory commands followed because the way the statute works and what the Supreme Court ordered in JAMA was first to the designated country next to the country of citizenship and that's step three is countries to which the individuals have a lesser connection. You only get to step four which is the far-flung countries if those other sequences don't attach. All of our class members, what the government is doing right now is jumping right to step four and deporting them to people. When you say that, I appreciate that. That's not in the complaint. You talk about it pretty briefly in the summary judgment papers and none of these four people seems like are suffering from that. I understand the problem. If the government is saying, because Dee especially, Dee says if you're a citizen of some other country and they'll take you, I understand there's no prejudice to the United States. There's no inadvisable language. It is just rock solid. That's where you're going. If they're not doing that, that would be a problem potentially but don't we need somebody who suffered that somewhere in this case that we can identify? The way the class is defined is all individuals with final orders which is all of our new plaintiffs who could be deported to a third country. The way that we envision and see this operating, the sequencing in B1 and B2 is inextricably intertwined with B3 which says any country to which we might seek to deport you, you have to have a right to apply for protection from persecution or torture. They're all operating in the same statute and B3 comes in as the predicate concern As I understood this case until the end was what you were concerned about is a lack of notice that prevented people from being able to exercise a B3 right because the B3 claim is the relationship of the person to the now identified country. That's how I understood this case all along. Now we're talking about I agree. I understand it's part of the same statutory scheme but a different fault, a different wrong thing. Assuming the lack of notice is a wrong thing by the government, a different wrong thing would be to skip over most prominently to meet D which would say you will go to your country of citizenship and say you know what? Forget about that. We're just going to put everybody into E and then we're just going to ship them off to wherever we feel like and if they did that, that would be problematic potentially but that didn't happen to any of the four named people and to just say it might happen to other class members, that doesn't seem like enough to get standing. When we filed the complaint, the March 30th memo is a product of the district court's temporary restraining order to come up with this process after we filed the complaint and it's not just that it could happen to class members, it is that it is happening to class members. How do we know that? Because you have the amicus brief from CGRS that talks about how people who have won protection from countries were deported to far-flung nations in Africa, Equatorial Guinea, Cameroon,  you name it and there's no connection of those individuals. Again, this is Article 3 standing. Don't we need a person in this case that we can identify who they are and say,  they skipped C and D and went right to E. Don't we need that person? Well, you have DVD and you have OCG so you have DVD who's... Explain why they fall into that category. Right. So, DVD faces sequencing because he cannot be deported or, well, he has a vested interest in being deported to Cuba if that is the country to which they're going to deport him, right? And if they don't go to Cuba, he's got a vested interest as the district court spelled out in the government following the process in the statute in order to find a country to which he has a lesser connection. He could have a mother or a father that has citizenship in Spain, for example. Well, the judge didn't order that, though. Judge Murphy didn't order anything about E and how it should function. He didn't... He... He ordered follow designated country, then follow country of citizenship, and only then go to E. So, are you saying as to DVD that they bypassed trying to send him to Cuba or... Well, I... Is there evidence of that? He has a cognizable interest in a potential injury if they do do that to him. But... What do you mean if they do do what? If they try to deport him to a fourth step country as opposed to following step one, two, and then three. But I don't want to belabor the point on sequencing. All the district court did on sequencing is said, basically, this is what the Supreme Court held in JAMA. You have to follow what the Supreme Court said in JAMA. And the regulation says that they have to, in the first instance, try to deport you to the country to which you were ordered removed. Right? And we have class members from Mexico, Jamaica, for example, who are in the record who were deported to countries even though they could have been deported to their country of origin. So I think that's what Judge Murphy was speaking to. Right? So one of the men in South Sudan, he was from Mexico and was deported to South Sudan. One of the men in Equatorial Guinea, you can see this in the Unger Declaration, was deported to Equatorial... The claim made that an effort was made to send them to Mexico and be buffed, or that didn't happen in any case? It didn't happen. And that's in the Hughes Declaration in the record. And with respect...  Hughes. And with respect to Equatorial Guinea, that's in the Unger Declaration. In fact, he showed up with a Jamaican passport because they had asked him to and fully expected to be deported to Jamaica. So he ended up in Equatorial Guinea. But I want to sort of get to the sort of larger claim we have here. Right? Which is we have the statute, the INA, B-3, and we have FARA, both of which prohibit removal to places where people can face persecution or torture. And these are mandatory protections. And the thrust of what we've been saying all along is people are entitled to meaningful notice and an opportunity to be heard, which is what Judge Murphy ordered. And this process takes place after the removal proceedings have concluded, which makes getting judicial review of any third country absolutely impossible. I'm happy to go to F or diplomatic assurances, whichever the court prefers. I'd rather hear about the diplomatic assurances. Sure. So one of the things that the government likes to say is that they're giving 24 hours of notice for people for which they don't have diplomatic assurances. But that's not correct because on the face of the policy it's 6 hours, maybe 24 hours. And we know from JGG and AARP two recent Supreme Court decisions that expressly held that 24 hours does not pass muster. So in the face of those decisions, they are still trying to cling to this notion that 6 hours of notice is somehow constitutional. It's not. And also within that time period they are expecting people to not just articulate a fear because they say within 24 hours you're going to have a screening and you've got to show that it's more likely than not that you'll be persecuted or tortured. And this court knows having heard tons of petitions for review there's a lot of work and evidence that have to go into developing.  That's their backup argument. Their first argument is we don't need to give notice because we have assurances from the countries. So why don't we go see if we can do that. Well, for the folks that don't have assurances that's one subset. Those exist, by the way? Does that happen on the ground or are they only using third party removals for countries with assurances? Oh, no. They are using removals largely to Mexico and deporting people saying we're deporting you to Mexico and the next thing they know the person if the person knows to articulate a fear maybe they'll have a fair interview but that interview no one is passing. That's using the 24 slash 6 hour That's happening quickly, right? There's no diplomatic assurance from Mexico. They're using the we tell you Mexico you get either 24 hours or 6 hours and then you're removed to Mexico.  Right. But I should say I don't know if we have diplomatic assurances to Mexico. No one does because they won't tell us where they have diplomatic assurances and that they don't. And so that's a huge problem with diplomatic assurances to begin with. But those Mexico clients or people are getting People from all different countries are getting sent to Mexico. No, they're getting the minimum the notice that the guidance is talking about. Well, I think that's discussed in the Florence Project amicus brief but they give the notice and sometimes that interview happens rapidly and the person is then just quickly deported. So, in effect that whole category under the policy violates due process for the reasons Judge Murphy identified because the notice is not sorry it's not provided to counsel and there's not sufficient time for a person to be able to articulate a fear. First of all they're not asked if they're afraid and second of all they're not explained what the process is if they are and Mullane and Goldberg and all of those take Is it Mullane because I mean Judge Murphy went off into an entire Matthews versus Eldridge analysis and I started to think about whether  well is that really the problem or is it really Mullane I mean there's a kind of claim you can bring with holding her cat and you need notice reasonably calculated to let you do that and this is insufficient for that and it's not really a balance it's more of a this notice just isn't it. I mean we think that it's both it's Mullane it's AARP as well they said you have to give notice and you actually have to explain to a person how they can raise and contest the designation they are under the alien enemies act so notice is not just hey we're telling you this but it's also notice of how you're to exercise your rights in order to make that notice meaningful and people have statutory rights and due process comes in to say this is how those rights are executed and this is what's required to make that statutory right meaningful. They have rights in your mind because both both fear based claims and contemplate hearings so now we're moving to the statutory part of the merits like we think that both the withholding statute and FARA and the regulations that implement both of those set up a scheme by which a hearing is required because only immigration judges can grant either withholding or CAT so the structure of the immigration system is such that you have to get a hearing because B3C talks about a trial of fact and burden of proof as do the CAT regulations as do the withholding regulations so we think to the court's question in  that there's a statutory basis for both people who are eligible for withholding and for  in order to demonstrate that they're entitled to notice and a meaningful opportunity to be heard and this is really something that's not in our briefing and I'm glad to have the opportunity to talk about is when CAT is terminated the regulations expressly provide that the government has to give person a notice of a hearing and that that person has between 10 and 13 days to provide evidence as to why CAT should not be terminated and then go to a hearing at which point they can examine the evidence and have a hearing about should CAT be terminated. That's if I'm going to be sent to the country that was initially thought to torture. Correct. And that's in the regulations that 208.7. That just goes to the idea that there's a process, there's a process that allows us to bypass all that. Critically my response is that there is no regulation about diplomatic assurances for people who are eligible for withholding. Zero regulation whatsoever. And to the extent that they want to transpose the CAT regulation about diplomatic assurances, the error there is the language of the regulation is individualized. This is a categorical blanket. No one is going to be persecuted or  It doesn't safeguard against persecution by non-state actors. And they like to make a big deal about the fact that they thought the district court was second-guessing the executive. Nobody is second-guessing the executive. We are talking about the process that everybody is entitled to. And these diplomatic assurances as the amicus brief has demonstrated shows examples of individuals who were deported to countries from where we had diplomatic assurances who were then turned around and were fouled to the countries from which they want protection. And so as a whole, right, we think the case that's instructive here is the third circuit decision in which the  simply decided they had diplomatic assurances and the third circuit said they were individualized and you have to have an opportunity to see them, to contest them, to examine them. But critically, we're talking about swaths of people here. And so regulations, both the plain language of the regulations, but in promulgating the regulations and in the testimony that, you know, the Congressional testimony that we addressed in our brief and that Judge Murphy talks about, all of those instances contemplated that the use of diplomatic assurances would be targeted to the individual and would be rare. That's in the preamble to the regulation. Now, applying it to thousands of individuals is not a rare instance. So it's a misuse of the regulation. And neither Munaf or Kayamba involved categorical blanket diplomatic assurances. And so, you know, we firmly push back on that. Further questions on that? Well, I mean, from their side, that is the nub of it. So your answer is basically it needs to be individualized. It is not. It doesn't apply to any  Let's say I think that's right. How does that affect this class which combines the groups of people? So I understand if it didn't apply to any, I kind of had my way, well, it's a fear based up here. But now maybe they break off. Then what? Well, in and of themselves. But it doesn't change the fact that blanket categorical diplomatic assurances, even with respect to anybody with a final order are not okay because they have to be individualized. And your reasons for that are the use of the articles, the way the diplomatic assurance is written for the alien, that's one point you make, right? Kuzam is the other point you make. Right. And then individuals have to have the opportunity to see that diplomatic assurance which nobody knows, right? Where does that come from? Is that from the reg or the Kuzam? It comes from Kuzam, it comes from due process, it comes from   If those diplomatic assurances don't work for one person, they don't work for all people, right? Because the protections in the statute attach to the person, they attach to all people who have due process rights, right? So that's imperative to our protection argument, right? The protection attaches to the person, not to the country. Related to that, what is your view of sort of I guess the argument I was making to your friend which is the way CAT and withholding really do operate at a granular level is a reason that just diplomatic assurances writ large can't possibly be correct. We agree with that absolutely because the statutes and regulations don't contemplate writ large blanket assurances. They contemplate individual trial of fact, burden of proof, testimony, judicial review quite frankly because the stakes are ultimately the judiciary is the check on the executive. I follow that but there is a thing about diplomatic assurances that was contemplated and I guess the answer is it's an individualized way around the hearing but it's person to person. Also that is the intent of the regulation. If you look at the Bellinger testimony, if you look at the federal register that promulgates that regulation, if you look at judge Murphy's footnote where he talks about this office of inspector general report, as of 2011 I think there were only four diplomatic assurances given and one of whom was Kuzan and three of whom were not ultimately deported. This is not a regulation that was intended to be applied to swaths of  Moving on to 1252F, we absolutely agree that Brito controls here. Before you get to 1252F, I'm more interested in 1252G in this sense. The government argues that a claim about where a noncitizen will be removed is necessarily a claim arising from a decision or action to execute a removal order. That makes a certain amount of sense to me. I'm just wondering if you could review for us why in your view 1252G doesn't apply here. Sure. I think where we start there is with the Supreme Court's decision in AADC, which this court endorsed and Jennings and Regents have endorsed. The Supreme Court said you interpret that provision as applying to three discrete actions that are discretionary. The reason it doesn't apply here is because plaintiff's claims are not discretionary. They are not saying you cannot execute a removal order. They're not seeking review of the removal order. Everybody agrees they have a removal order. What they are saying is there are mandatory protections that need to come before execution of the removal order. I think it's instructive to look at what the 9th Circuit did in Ibarra-Perez where they went through that exact analysis. The government is going to stand up here and talk about RAUDA and not mention Ibarra-Perez because Ibarra-Perez is a third country 9th  case that directly contradicts RAUDA. But more importantly here you have the constitution  binding on 1252G and  ADA analysis and we also know post-ADA we have Jennings saying 1252G is not a bar to a policy where the policy was deferred action was stop removal and Judge that the nature of the claim doesn't matter that 1252G is  to discretionary determinations and it doesn't apply to claims like we have here and this is critical that are independent of or wholly collateral to the removal process which is what we have. We're not challenging removal order.  claims arise after removal. We're going to try to get this person out of the  Then how you do it, the steps you take, that's not G. G is the decision to execute the order. We're saying that mandatory things have to happen. We're not saying you cannot execute their removal order. Nobody is saying you can't execute it. We're talking about where it is executed to and we're talking about the protections that have to apply. The weather we should do is covered by G. How we go about doing it is not. It's  to and  of. This sort of case fits exactly into what this court was doing and saying in Aguilar and Jennings in terms of all of their arguments that these folks could have raised their country to Mexico and ended up in Mexico. The facts are there. But they're also going to try to say that motions to reopen are available. We know that Judge Murphy made numerous findings based on the record that motions to reopen are we've put in a ton of decisions saying that they are routinely denied as skeptical because you can't seek reopening to a country that no one is trying to deport them to. We've put in a ton of denials about them. And remember, this court is reviewing Judge Murphy's factual findings for clear error. We don't think there is any clear error in terms of the motion to  reopen  Now, the government is going to say the record contains examples. Oh, the record contains two examples of reopening that the government put in in conjunction with the emergency stay application. But that's not part of the record. That's part of what they put in for the  stay application, not what Judge Murphy reviewed, which is the ton of declarations and evidence saying these claims cannot be raised. And rejecting their argument that they can be raised in the context of an  application, which doesn't require them to indicate anything. But also it's besides the point because you have a   were deported to South Sudan and are now still held under armed arrest in South Sudan. Three of them were ordered removed before South Sudan even became a country. So that sort of logic doesn't add up. I would like to get to 1252F if I can. Can you tell me about 1231H? Where the Supreme Court rejected that argument and said the only thing about 1231H is that in of itself standing alone this is not a statute that independently creates a cause of action. You think that's what it does. Do not courts create an implied cause of action. 1231 doesn't do that. But of course our cause of action is APA. That's what you think the work of 1231H is to make clear to courts there are no implied causes of action different from some other statutory cause of action you may have. Are there any other cases besides Zed bias? I think in their recent case they also rejected that but other courts have rejected the 1231H argument which the government resurrected in briefing but hasn't gotten traction from any court posted by this. Very briefly, I think it's quite clear that Alam and Gonzalez footnote two, Biden versus Texas footnote four, they all reserve this question of declaratory relief and set-aside relief. And a reserved question cannot overturn this court's  That's not how precedent works. On declaratory relief, this court's decision in Brito is consistent with the D.C. circuit, the third circuit and the ninth circuit. On set-aside I understand all of what you're saying and I try to make their point. Judge Cayonta has a definition suggested he refers to preliminary relief and the final order of relief. Your friend's argument is those are not meanings used in  so that's supposed to do the work to say that under the words used by Al-Aman a declaratory judgment have the effect of checking or holding back officers because they will do what the declaratory judgment says they should do. My response to that is what the Supreme Court said in    result is that declaratory relief is a milder alternative to injunctive relief. You can't get contempt with declaratory relief. The analysis looks at the title of 1252F1 but it also critically looks at 1252E1A which is enacted at the same time where Congress demonstrated that it knows how to bar declaratory relief, injunctive relief or other equitable relief. It's critical to both the  relief and the set-aside aspect. Congress knows how to bar relief under the APA when it was  The Supreme Court looked at that and said we're talking about an injunction. The title of the text matters.  downstream effect idea doesn't make sense because the APA itself, section 706, says that the reviewing court can hold and set aside agency action. If you were to go a different way on this, you'd be creating a circuit split with the 5th  the DC circuit and the 9th circuit, all of whom have said vacater is not barred by F1. I guess last but not least, I will just say that this is a quintessential class action in the sense that all class members and all plaintiffs are challenging the same policy.  suffering the same deprivation of process and they're seeking the same forward-looking relief. That uniform injury is the ability to decide whether to bring a base claim and then pursue it. Step one is should I do it, which I can't know until I know where I'm going. That is critical. Step one is to know it. The uniform policy here is about the process. The process that people get include the notice and then they get to decide if they have a persecution claim but you can't know that. The uniformity of the challenge, they're missing the point by trying to bring up red herrings of status. The case is not about who ultimately qualifies for persecution. It's about whether everyone is entitled to a lawful and fair process before a third country removal takes place. That is resolved through a class action because the face of the government's memo itself, that memo was drafted to mirror our class because it came out right after Judge Murphy's TRL and it applies not to people in expedited removal. That's a red herring as well. It applies just to people in removal proceedings and DHS summary proceedings. If the court doesn't have any further questions, I would ask that you  reintroduce yourselves on the record to begin the four-minute rebuttal. I have four quick points to tick through in my four minutes. First, starting with 1231H, Zadvidas, if that's the best thing my friend has to point to, I just think    that's a non-starter. Zadvidas was about a lack of statutory authority to detain. 1231H didn't seem to be an impediment to  If I recall correctly, it wasn't raised and I don't think it provides insight if the argument wasn't made and wasn't considered. I don't recall any discussion of it. They think it precludes implied cause of action. What do you think it does? I think it means the things set out in 1231 can't serve as the right that's being infringed, the interest infringed for purposes of an APA claim or a liberty interest for a due process claim. It is foreclosing all other causes of action.    preclude APA actions. It doesn't do that. It does say you can't use 1231 to say you have a substantive or procedural right that's enforceable against the United States. We have a right to this sort of sequencing. We have a right to this amount of      If that's right, these things are just suggestions to the government? Not at all. They are binding on the executive branch.  a duty to execute the laws faithfully. That duty exists regardless of whether it's judicially enforceable. It doesn't make the statutory commands optional. It just means they're not judicially reviewable. Second, as to 1252G, I hear my friend say that it applies only to discretionary decisions. Circuit after circuit has rejected that. Compliance with the Constitution is not discretionary. I don't think that's a persuasive account. My friend says 1252G is narrow. They're saying you can't execute my removal order at this time. Again, court after court has said that when question is precisely what 1252G refers to. I would point to EFL, as my friend predicted,  Hamama, which all considered that one question because the plaintiffs had pending claims for relief from removal. I'm happy to speak to Ibarra-Perez. We think it's wrong. We have a pending on bond petition to that effect. I wanted to speak to the amount of notice. The six-hour provision applies only when approved by  the DHS general counsel. We think that's also significantly distinct from the 24 hours that didn't include that guarantee. Your view is the 24 hours is the default notice and six hours is the if there's some other reason with higher-level approval. Exigent circumstances approval by the DHS general counsel. Very unusual and again requires that the alien have a chance to speak with their attorney. I heard my friend say the whole category of individuals not subject to diplomatic assurances violates due process. There are distinct legal questions raised with respect to aliens subject to diplomatic assurances and aliens who are not subject to  diplomatic  That just shows the court can't resolve the due process claims with respect to the entire class in a single stroke. That's absolutely an Achilles heel. I'll leave aside my sequencing points but we would just ask the court to reverse. Thank you. Thank you. God save the United States of America.